Filed 10/29/12

# IN THE SUPREME COURT OF CALIFORNIA

In re ELVIN CABRERA,

on Habeas Corpus.

S197283

Ct.App. 5 F059511

Prison regulations promulgated by the California Department of Corrections and Rehabilitation (CDCR) set forth the procedures and substantive requirements for validating an inmate as a member or associate of a prison gang. Because gangs "present a serious threat to the safety and security of California prisons" (Cal. Code Regs., tit. 15, § 3023, subd. (b)), validation of an inmate as a gang member or associate can result in the inmate's placement in a security housing unit (SHU).

The current dispute arose when the CDCR validated petitioner Elvin Cabrera as a gang associate—i.e., "an inmate . . . who is involved periodically or regularly with members or associates of a gang." (Cal. Code Regs., tit. 15, § 3378, subd. (c)(4) (hereafter section 3378)). Under section 3378, validation of an inmate as an "associate" requires at least three "independent source items of documentation indicative of association" with persons who have been classified as gang members or associates. (*Ibid*.) At least one of the source items must be a "direct link" to a current or former gang member or associate. (*Ibid*.)

The question presented for our review, which involves the meaning of this prison regulation, is very narrow. In essence, the CDCR contends that the Court

1

of Appeal erred by independently interpreting the scope of the regulation's requirement of a "direct link" between the inmate and a gang member or associate with respect to one category of source items—a category called "Association" (§ 3378, subd. (c)(8)(G))—instead of deferring to the CDCR's interpretation of its own regulation.[1]  For the reasons that follow, we agree the Court of Appeal failed to accord due deference to the CDCR's interpretation of its own regulations, and therefore reverse the judgment awarding habeas corpus relief and remand the matter to the Court of Appeal for further proceedings.

## BACKGROUND

In 2003, Cabrera was convicted of robbery, burglary, receiving stolen property, and possession of drug paraphernalia.  He was sentenced to prison for 62 years to life.  He is incarcerated at the California Correctional Institution at Tehachapi.

On May 13, 2008, Cabrera was officially identified—or "validated," in the words of the CDCR regulation (§ 3378, subd. (c)(4))—as an associate of the Mexican Mafia prison gang.  The validation was based on the discovery in his prison cell of several photocopied drawings containing symbols distinctive to the gang. Two of the drawings were signed by validated affiliates[2] of the Mexican Mafia.

---

[1]     Section 3378 uses the term "association" in two different contexts:  first in subdivision (c)(4) to explain that "identification" as an "associate" requires at least three independent source items of documentation "indicative of association," and later in subdivision (c)(8)(G) as the label ("Association") for one category of source items.  In this opinion, we address the term's meaning only in the latter context.

[2]     Like the parties, we use the term "affiliate" to refer collectively to gang members and associates.

Cabrera challenged his validation through the CDCR administrative appeal process, but his appeal was denied. Cabrera then filed a petition for writ of habeas corpus in Kern County Superior Court. The superior court denied the petition, finding that his validation as a gang associate was supported by three source items of gang validation with two direct links to gang affiliates.

Cabrera filed an original petition in the Court of Appeal, which issued an order to show cause and then granted relief in a published opinion. The Court of Appeal's decision to grant relief rested on a disagreement with the CDCR over the interpretation of the CDCR's own regulation. In the view of the Court of Appeal, the regulation providing that at least one source item indicative of association with validated gang affiliates be a "direct link" to a current or former validated gang affiliate (§ 3378, subd. (c)(4)) required in these circumstances a "reciprocal (i.e., mutual or two-way) interaction between the two individuals forming the relationship." Having found insufficient evidence of such a reciprocal relationship, the Court of Appeal granted the writ and ordered the CDCR to expunge Cabrera's validation as an associate of the Mexican Mafia gang and to cease housing Cabrera in the SHU to the extent the assignment had been based on the gang validation. In light of its disposition, the Court of Appeal found it unnecessary to consider Cabrera's other challenges to the validation order.

We granted review to resolve a question of law concerning the deference owed to the CDCR in interpreting its own regulations governing the identification of inmates as prison-gang affiliates.

## DISCUSSION

It is a " 'black letter' proposition" that there are two categories of administrative rules—quasi-legislative rules and interpretive rules—and that the distinction between them derives from their different legal foundations and ultimately from the constitutional doctrine of the separation of powers. (*Yamaha*

3

*Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 10 (*Yamaha*).)
Quasi-legislative rules are those that the agency promulgates as part of the
lawmaking power the Legislature has delegated to it, and are subject to "very
limited" review. (*Sara M. v. Superior Court* (2005) 36 Cal.4th 998, 1012.) " 'The
courts exercise limited review of legislative acts by administrative bodies out of
deference to the separation of powers between the Legislature and the judiciary, to
the legislative delegation of administrative authority to the agency, and to the
presumed expertise of the agency within its scope of authority.' " (*San Francisco
Fire Fighters Local 798 v. City and County of San Francisco* (2006) 38 Cal.4th
653, 667.) Rules that interpret a statute, on the other hand, receive less judicial
deference. (*Sara M.*, *supra*, 36 Cal.4th at p. 1012.)

The Legislature has "provided no specific guidance regarding how
prisoners should be classified" (*In re Jenkins* (2010) 50 Cal.4th 1167, 1173), but
has instead delegated lawmaking power to the CDCR to "prescribe and amend
rules and regulations for the administration of the prisons." (Pen. Code, § 5058;
see also *id.*, § 5068.) "By enacting these statutes, '[t]he Legislature has given the
[secretary] broad authority for the discipline and classification of persons confined
in state prisons. [Citations.] This authority includes the mandate to promulgate
regulations governing administration, classification, and discipline.'" (*In re
Jenkins*, *supra*, 50 Cal.4th at p. 1173.)

Section 3378 (the regulation at issue here) is a quasi-legislative rule
promulgated by the CDCR to identify and manage inmates with a prison-gang
affiliation. Because the CDCR, like any agency granted this sort of substantive
lawmaking power, is "truly 'making law,' [its] quasi-legislative rules have the
dignity of statutes. When a court assesses the validity of such rules, the scope of
its review is narrow. If satisfied that the rule in question lay within the lawmaking
authority delegated by the Legislature, and that it is reasonably necessary to

4

implement the purpose of the statute, judicial review is at an end." (*Yamaha*, *supra*, 19 Cal.4th at pp. 10-11.) "The substitution of the judgment of a court for that of the administrator in quasi-legislative matters would effectuate neither the legislative mandate nor sound social policy." (*Pitts v. Perluss* (1962) 58 Cal.2d 824, 835.)

No party disputes that section 3378 is within the scope of the authority conferred by the Legislature on the CDCR. Rather, the question here is how to interpret one of the provisions in section 3378 governing validation of an associate of a prison gang. The Court of Appeal and the CDCR have differing views as to the interpretation of this provision of section 3378. But resolution of their dispute must acknowledge one simple observation: "we defer to an agency's interpretation of its own regulations, particularly when the interpretation implicates areas of the agency's expertise." (*Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459, 505.)

The text of section 3378, subdivision (c)(4) provides: "An associate is an inmate/parolee or any person who is involved periodically or regularly with members or associates of a gang. This identification requires at least three (3) independent source items of documentation indicative of association with validated gang members or associates. Validation of an inmate/parolee or any person as an associate of a prison gang shall require at least one (1) source item be a direct link to a current or former validated member or associate of the gang, or to an inmate/parolee or any person who is validated by the department within six (6) months of the established or estimated date of activity identified in the evidence considered." Section 3378 lists 13 different categories of source items indicative of association with validated gang affiliates, including an inmate's admission of involvement with the gang, tattoos and symbols distinctive to the gang, written

5

material or communications evidencing gang activity, the inmate's association with validated gang affiliates, and offenses reflecting gang affiliation. (§ 3378, subd. (c)(8).)

In this case, the source items underlying the CDCR's validation of Cabrera as a gang associate consisted of several photocopied drawings containing symbols assertedly distinctive to the Mexican Mafia. Two drawings depict armed women (one with a spear, one with a revolver) and contain a "Matlactomei" symbol (the Mayan symbol for 13), which consists of two vertical lines and a vertical column of three dots. The number 13 refers to "M," the 13th letter in the alphabet, and is used as a designation for the Mexican Mafia gang. (See *People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1544.) One of these drawings is signed by a validated associate of the Mexican Mafia. Another drawing depicts a female Mesoamerican warrior armed with a sword and shield as well as a bow and quiver of arrows. An "eternal war shield," which demonstrates loyalty to the Mexican Mafia, is on her chest. A fourth drawing, which features Mesoamerican and imprisonment themes, is signed by a validated member of the Mexican Mafia. The prison's institutional classification committee concluded that the drawings depicting the gang symbols qualified as source items under the "Tattoos and symbols" category of the regulation (§ 3378, subd. (c)(8)(B))[3] and that the signed drawings qualified as source items under the "Association" category (*id*., subd.

---

[3] "Tattoos and symbols. Body markings, hand signs, distinctive clothing, graffiti, etc., which have been identified by gang investigators as being used by and distinctive to specific gangs. Staff shall describe the tattoo or symbol and articulate why it is believed that the tattoo or symbol is used by and distinctive of gang association or membership. Staff shall document and disclose this information to the inmate/parolee in a written form that would not jeopardize the safety of any person or the security of the institution." (§ 3378, subd. (c)(8)(B).)

6

(c)(8)(G)).[4]  The committee further found that Cabrera's possession of two drawings signed by validated Mexican Mafia affiliates directly linked him to those gang affiliates.

The Court of Appeal accepted the CDCR's definition of "direct link" (§ 3378, subd. (c)(4)) as encompassing a connection that is " 'without interruption or diversion' and 'without any intervening agency or step.' "  The Court of Appeal also accepted the CDCR's definition of "association with validated gang affiliates" (§ 3378, subd. (c)(8)) to mean "a 'loose relationship as a partner, . . . colleague, friend, companion, or ally' with a validated gang affiliate."  This connection could be established, according to the Court of Appeal, by "information related to the inmate's loose relationship with a gang affiliate."

But the Court of Appeal departed from the CDCR's construction of the regulation when the court purported to "combine the definitions and reach a conclusion as to what is meant by 'direct link' when the source item used is the inmate's 'association with validated gang affiliates' ":  "The relationship, whether characterized as one of partners, colleagues, friends, companions, or allies, must involve *reciprocal (i.e., mutual or two-way) interaction* between the two individuals forming the relationship.  In other words, the requisite relationship cannot be created solely by one party's action; there must be some assent or mutuality from the other party."  The Court of Appeal then relied on the lack of evidence of "a mutual relationship, even a loose one," to conclude that the CDCR

---

[4]  "Association.  Information related to the inmate/parolee's association with validated gang affiliates.  Information including addresses, names, identities and reasons why such information is indicative of association with a prison gang or disruptive group.  Staff shall document and disclose this information to the inmate/parolee in a written form that would not jeopardize the safety of any person or the security of the institution."  (§ 3378, subd. (c)(8)(G).)

had failed to establish a direct link between Cabrera and any validated gang affiliate and, on that basis, granted relief.

In announcing its interpretation of the CDCR regulation, the Court of Appeal acknowledged that the CDCR had construed the regulation to have a broader scope. In the CDCR's view, the regulation's requirement of a direct link does not require evidence of a reciprocal or two-way interaction between the inmate and the validated gang affiliate in these circumstances. Yet, in rejecting the CDCR's interpretation, the Court of Appeal offered neither deference to the agency's view nor acknowledgement of the agency's expertise in prison management. This was error.

"As a general matter, courts will be deferential to government agency interpretations of their own regulations, particularly when the interpretation involves matters within the agency's expertise and does not plainly conflict with a statutory mandate." (*Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection*, *supra*, 44 Cal.4th at p. 490.) The question of how best to identify gang affiliates in the prison setting "is a judgment call, and we will not disturb the agency's determination without a demonstration that it is clearly unreasonable." (*Ibid*.)

The Court of Appeal never contended that the CDCR's interpretation of section 3378 was clearly unreasonable. It instead chided the CDCR for appearing to rely "on an overly broad interpretation of our opinion in *In re Furnace* [(2010) 185 Cal.App.4th 649]," which, the Court of Appeal contended, did not address "whether mutuality or reciprocity was inherent in the concept of 'association.' " Because that issue had not been decided in *Furnace*, the Court of Appeal concluded that "the *Furnace* decision does not prevent us from interpreting 'association' to mean a mutual relationship" when a direct link is sought to be established through the source item category of "association."

8

The issue before the Court of Appeal, though, was not whether a prior judicial decision had compelled the CDCR's interpretation of the regulation, but (rather) whether the construction offered by the CDCR, the agency that had promulgated the regulation and was charged with enforcing it, was clearly unreasonable.

Cabrera, by contrast, *does* argue that the CDCR's proffered interpretation is clearly unreasonable. He relies on *In re Andrade* (2006) 141 Cal.App.4th 807, but the case is clearly distinguishable. In that case, the Court of Appeal relied on the "plain language" of the regulation to determine that the interpretation proffered by the Board of Prison Terms (now the Board of Parole Hearings) was "clearly erroneous." (*Andrade*, *supra*, 141 Cal.App.4th at pp. 815, 817.) The regulation at issue directed the Board to consider "whether '[t]he prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.' " (*Id*. at p. 815, quoting Cal. Code Regs., tit. 15, § 2402, subd. (d)(8).) The Board had required the prisoner (Andrade) to prepare California parole plans, even though Andrade conceded he had entered the country illegally, planned to return to his native country, and there was a "great probability" he would be expeditiously deported once released. (*Andrade*, at p. 816.) After consulting dictionary definitions of "realistic," the Court of Appeal concluded that the contingency of Andrade's remaining in the United States could not reasonably be deemed realistic, given that he could not remain here legally and no employer could legally employ him. (*Id*. at pp. 816-817.) In short, the Court of Appeal found it could not be realistic to "require the prisoner to plan for the contingency that the government might fail to do its job of deporting him. . . . It is self-evident that the government may not require as a condition of parole that someone arrange to violate the law." (*Id*. at p. 817.)

Here, by contrast, nothing in the plain language of section 3378 requires proof the inmate formed a reciprocal or mutual relationship with a validated gang affiliate in order to establish a direct link, via the source item category of association, with that gang affiliate. The Court of Appeal appears to suggest that such a requirement would nonetheless be necessary as a matter of policy, for "[o]therwise, a validated gang affiliate could create such a relationship with an inmate unilaterally, without any assent or mutuality on the part of the inmate." But the CDCR has not claimed the requisite connection could be formed by unilateral conduct by the validated gang affiliate. Rather, as the Court of Appeal acknowledges in the very next sentence of its opinion, the connection contemplated by the CDCR is "unilateral action *by an inmate*."

Moreover, the CDCR's policy of relying on unilateral inmate conduct to satisfy the direct link to a validated gang affiliate is not clearly unreasonable. Gangs "present a serious threat to the safety and security of California prisons." (Cal. Code Regs., tit. 15, § 3023, subd. (b).) " 'Prison gangs are criminal organizations that must communicate with their affiliates to conduct gang business, ensure group solidarity, and recruit and train new affiliates. Indeed, one of the primary duties of a gang affiliate is to establish a line of communication between himself and other gang affiliates.' " (*In re Furnace*, *supra*, 185 Cal.App.4th at p. 660.) Even though prison officials "restrict correspondence between inmates, and are especially restrictive of the correspondence of validated gang affiliates housed in a security housing unit" (*ibid*.), the declaration of Everett W. Fischer, an expert in the Mexican Mafia prison gang, explained that gang affiliates attempt to evade detection by using coded and hidden messages in drawings and photos. Moreover, a gang affiliate may collect or keep a copy of such artwork to demonstrate his association with that validated gang member or associate. "As a result," the expert declared, "something seemingly innocuous as

10

a drawing can promote gang activity among inmates, which undermines the order and security of the institution." A requirement that prison officials demonstrate reciprocal interaction to establish a direct link between the inmate and a validated gang affiliate thus could seriously impair efforts to detect and prevent gang activity in prisons.

Because the Court of Appeal's grant of habeas relief rested on the erroneous assumption that a direct link in this context required proof Cabrera had a mutual relationship with a validated gang affiliate, we reverse the judgment. Whether the evidence is sufficient, under the regulation as properly construed, to uphold the validation of Cabrera as a gang associate, and whether the validation and placement in the SHU otherwise violates any of Cabrera's rights, is for the Court of Appeal to decide on remand in the first instance.

## DISPOSITION

The judgment of the Court of Appeal is reversed, and the matter is remanded for further proceedings consistent with this opinion.

BAXTER, J.

WE CONCUR:

CANTIL-SAKAUYE, C.J.
KENNARD, J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
LIU, J.

11

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** In re Cabrera
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 198 Cal.App.4th 1548
**Rehearing Granted**

_____

**Opinion No.** S197283
**Date Filed:** October 29, 2012
_____

**Court:**
**County:**
**Judge:**

_____

**Counsel:**

Elvin Cabrera, in pro. per.; Michael Satris, under appointment by the Supreme Court, and Melanie K. Dorian, under appointment by the Court of Appeal, for Petitioner Elvin Cabrera.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Donald E. DeNicola, Deputy State Solicitor General, Julie L. Garland and Jennifer A. Neill, Assistant Attorneys General, Anya M. Binsacca, Amy Daniel, Jessica N. Blonien and Henry J. Valle, Deputy Attorneys General, for Respondent Warden Kim Holland.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Michael Satris
Post Office Box 337
Bolinas, CA  94924
(415) 868-9209

Amy Daniel
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA  94244-2550
(916) 322-6105