Filed 11/18/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re MANUEL MARTINEZ,<br><br>    on Habeas Corpus. | A142502<br><br>(Del Norte County<br>Super. Ct. No. HCPB13-5073) |

In April 2013, Manuel Martinez, an inmate at Pelican Bay State Prison, filed a habeas corpus petition in Del Norte County Superior Court. Martinez challenged the December 2011 decision by California Department of Corrections and Rehabilitation (CDCR) officials at Pelican Bay to "validate" him as a gang associate of the Mexican Mafia pursuant to former section 3378 of Title 15 of the California Code of Regulations,[1] which validation led to his transfer to Pelican Bay's Security Housing Unit (SHU) for an indeterminate term. In May 2014, the trial court granted Martinez's petition, ordering his gang validation expunged and his residency in the SHU based on that validation terminated. Clark E. Ducart, the Warden of Pelican Bay State Prison (warden), filed a notice of appeal. The warden asks that we overturn the trial court's order and deny Martinez's petition.

---

[1] All section citations herein are to Title 15 of the California Code of Regulations. For clarity's sake, our references herein to "section 3378" are to the regulation in place at the time of Martinez's validation. Revisions to section 3378 became operative after Martinez's validation in December 2011. (Cal. Code Regs., tit. 15, § 3378, Register 2014, No. 42 (Oct. 17, 2014) p. 188.66.) The parties' briefs do not discuss these revisions and at oral argument counsel for the state stated that the new regulations are not applicable to this petition. We therefore do not discuss them.

To validate Martinez as a Mexican Mafia[2] gang associate, Pelican Bay officials were required to establish by some evidence a "direct link" between Martinez and a Mexican Mafia "validated member or associate," also known as an "affiliate," which must be a specific person.  (§ 3378, subd. (c)(4), (c)(8)(D) & (G); *In re Villa*, (2013) 214 Cal.App.4th 954, 970 (*Villa*).)  The CDCR, with our Supreme Court's approval, has interpreted this "direct link" "as encompassing a connection that is " 'without interruption or diversion' and 'without any intervening agency or step.' "  (§ 3378, subd. (c)(8); *In re Cabrera* (2012) 55 Cal.4th 683, 690–692 (*Cabrera I*).)  The warden asserts that Martinez's participation in a prison "disturbance" (Martinez prefers prison "protest") of Southern Hispanics ordered by a person who was later validated as a Mexican Mafia associate (the Mexican Mafia affiliate) establishes this direct link.

We disagree.  The warden's evidence shows that Martinez participated in a prison disturbance along with almost 200 Southern Hispanics and Sureños in Facility B that was ordered by the Mexican Mafia affiliate.  It does not establish that Martinez participated knowing the disturbance was ordered by the Mexican Mafia gang affiliate (as opposed, for example, to participating at the insistence of another person).  In other words, the warden's evidence shows Martinez acted consistent with the order of the Mexican Mafia affiliate, but not that he did so in order to comply with an order from that specific person.  The warden does not provide any evidence connecting Martinez to the Mexican Mafia gang affiliate—the only person relied on by Pelican Bay officials to establish the requisite "direct link"—without an intervening step or interruption.  Thus, there is no evidence of this "direct link" between the two.  Martinez should not have been validated as a Mexican Mafia gang associate.  We affirm the trial court's grant of Martinez's petition on this ground.  We also decline the warden's implied invitation to expand the CDCR's definition of "direct link" to require nothing more than some evidence of a "straight-forward connection," no matter how attenuated, with a gang member or

---

[2]  The Mexican Mafia is sometimes referred to in the record as "EME."  For clarity's sake, we refer to it as the Mexican Mafia throughout this opinion.

associate, just as the Fifth District declined to do in *In re Cabrera* (2013) 216 Cal.App.4th 1522, 1535–1540 (*Cabrera II*), upon the remand ordered in *Cabrera I*.

## BACKGROUND

### I.

#### *Martinez's Validation as a Mexican Mafia Gang Associate*

In December 2011, Pelican Bay officials validated Martinez as a Mexican Mafia "associate." An "associate" is "an inmate . . . who is involved periodically or regularly with members or associates of a gang." (§ 3378, subd. (c)(4).)

In order to validate Martinez, Pelican Bay officials were required to produce at least three "source items," one of which had to be a "direct link" to a validated gang member or associate, including those validated by the CDCR within six months of the established or estimated date of the activity identified.[3] (§ 3378, subd. (c)(4).) Pelican Bay officials validated Martinez as a Mexican Mafia associate based on four source items. The first three were a drawing found in Martinez's possession that prominently depicted a symbol that Mexican Mafia members commonly used to display their gang loyalty; a tattoo on Martinez's back of a symbol Mexican Mafia members similarly used to show their gang loyalty; and a 2008 rules violation report stating that Martinez and three other Southern Hispanic inmates assaulted two Northern Hispanic inmates. Martinez does not contest the validity of these three as "source items," and we shall not discuss them further in any detail.

The fourth source item, which Pelican Bay officials relied on to establish the "direct link" requirement, was a July 2006 rules violation report by Lieutenant A. Navarro. Navarro stated that on June 26, 2006, Martinez and his cellmate participated "in a disturbance which threatened the Institutional Security by covering or barricading their cell front. This act was a continuing effort of the Facility B Southern Hispanic Inmate population in a show of solidarity to protest the moving of any Southern Hispanic

---

[3] The record indicates that the Mexican Mafia affiliate was timely validated after the June 26, 2006 disturbance in which Martinez participated.

Inmate." According to Navarro, every Southern Hispanic inmate on B Facility had refused to move from their assigned cell in a disturbance that began on June 24, 2006, but he did not indicate Martinez had participated in the disturbance before June 26. "These Inmates acted in an organized and structured manner, clearly demonstrating that these actions were planned, organized and consistent with Southern Hispanic group gang activity." Navarro further reported that Martinez and his cellmate were ordered, but refused, to remove their cell covering and submit to handcuffs, refused orders to exit their cell and were then subdued.

## II.

### *The Declaration of J. Beeson*

Agent J. Beeson, the Pelican Bay CDCR official who validated Martinez as a gang associate, submitted two declarations to the trial court, one filed in the court's public records and one filed under seal.[4] Beeson stated that he had worked on gang issues for the past 15 years as a correctional officer, sergeant and then supervising lieutenant at the Institutional Gang Investigations Unit at Pelican Bay until 2009, when he became a special agent in the Office of Correctional Safety of the CDCR. As a result of his experience, which included "countless education courses focusing on gangs, and especially prison gangs," he was "very familiar with the dynamics of prison gangs and their affiliates." He had taught courses on prison gangs for the CDCR and other law

---

[4] The trial court asked for and considered in camera confidential material filed under seal by the warden that was not provided to Martinez, and the warden submits this material to this court under seal as well. Martinez objects to our consideration of these materials as a violation of his Sixth Amendment rights, while the warden argues such rights do not apply to prison disciplinary actions and that the warden has waived this argument by failing to object below. We do not decide this question in light of our conclusion that none of the warden's evidence establishes a "direct link." For the purposes of this appeal only, we assume the validity and accuracy of the materials filed under seal.

Also, we have previously ordered that the warden's motion to file an unredacted version of his opening brief be held in abeyance. We hereby grant that motion and have considered this unredacted version as well.

4

enforcement agencies and had qualified to testify as an expert witness on prison gangs approximately ten times.

Beeson stated that the CDCR was "committed to identifying which inmates are involved in prison gangs in order to suppress gang activity because gangs pose such an incredibly invidious and serious threat . . . to safety and security within our prisons . . . . The Mexican Mafia . . . prison gang is one of seven prison gangs currently recognized by the CDCR." "Validation is a quality control mechanism used by CDCR to assure that an inmate who is suspected of gang involvement is correctly identified as a member or associate of his gang so he can be classified and housed appropriately. . . . [¶] . . . By validating inmates as prison gang members or associates, we can then remove them from the general population, and thereby make our prisons safer while also giving other inmates the opportunity to program without being influenced or controlled by the gangs and their subordinates."

Beeson further stated that he was familiar with Martinez and had reviewed and accepted his validation packet in December 2011. Beeson identified as "source item four" Navarro's June 2006 rules violation report, which documented Martinez's participation in the June 26, 2006 disturbance. Beeson further stated that, "[i]n finding Martinez guilty of the disciplinary offense, the senior hearing officer relied on three confidential memoranda demonstrating that the disturbance was an organized effort by Southern Hispanic inmates protesting their programming." Beeson stated that 193 inmates—all Southern Hispanic, like Martinez—participated in the disturbance.

Beeson summarized the three confidential memoranda in his publicly filed declaration. These memoranda documented conversations, first on June 22, then June 23, 24 and 25, 2006, just prior to the June 26, 2006 disturbance, between a correctional officer and an inmate residing in Facility B who "associate[d] himself as a Southern Hispanic and was a participant in the disturbance." The correctional officer was told about the "consensus" among inmates "associating themselves as Southern Hispanics" regarding "recent program changes" in Facility B; "information regarding the extent of Southern Hispanic inmates' involvement in any classification committee or moves

5

associated with the new program"; statements that "impl[ied] the identification of the inmate responsible for orchestrating the disturbance, its duration, and who [would] be the participants"; and that "the disturbance was an organized protest against the administration at Pelican Bay."

Beeson also stated that the disturbance was conducted by Southern Hispanic inmates in Martinez's facility at the instigation of the Mexican Mafia gang affiliate, who was a "Mesa" member who wielded the power of the gang and was " 'in control' and a 'representative' of the [Mexican Mafia] on . . . Facility B, yard." According to Beeson, Martinez's actions "were synchronized with those of all the inmates on the . . . Facility B who identified themselves as 'Surenos,' " whom Beeson defined as "Southern Hispanic inmates loyal to the [Mexican Mafia] prison gang." More than 400 inmates of "other races and gang affiliations" in the same facility did not take part.

Beeson summarized the evidence as indicating that Martinez participated in the disturbance "on the direct orders of the [Mexican Mafia] associate. While the [Mexican Mafia] associate likely did not appear at Martinez's cell door and deliver the order personally, our gang intelligence confirms that the order was in fact given by the [Mexican Mafia] associate, and it was followed by all who are loyal to the gang. This is how gangs operate; gang leaders or those with authority give orders which trickle down to the gang affiliates who in turn demonstrate their allegiance to the gang by doing as they are told." "By participating in the disturbance," Beeson concluded, "Martinez demonstrated his support for and allegiance to the [Mexican Mafia]."

Beeson continued, "The important fact here is that Martinez, like all other 'Surenos' on Facility B, followed the direct order from the validated [Mexican Mafia] associate who was a member of the 'Mesa.' . . . [¶] In reviewing all of the information available, based on my knowledge, training, and experience as a gang investigator, I concluded there was sufficient evidence that Martinez's participation in the disturbance was as a result of him receiving, verifying, and acting upon the orders of the [Mexican Mafia] prison gang, constituting a direct link to the validated [Mexican Mafia] associate who gave the order."

6

Beeson's confidential declaration and the other confidential materials do not add anything consequential to our analysis. None of them establish that Martinez knew the June 26, 2006 disturbance was ordered by, or that Martinez had any connection specifically to, the Mexican Mafia affiliate, although that affiliate is the only person with whom Pelican Bay officials claimed Martinez was directly linked.[5]

In this appeal, CDCR relies on this fourth source item, along with the support of Beeson's declarations and the confidential materials submitted under seal to the superior court, for its contention that the evidence showed a direct link between Martinez and the Mexican Mafia gang affiliate who organized the June 26, 2006 disturbance.

### III.

### *The Administrative Appeals Process and Martinez's Habeas Petition*

Martinez appealed his validation to the warden. The warden denied this appeal, concluding that Martinez's gang validation had comported with all relevant regulatory and due process requirements.

Martinez then petitioned to the CDCR Office of Appeals. It denied his petition because it found "no evidence of a violation of existing policy or regulation by the institution based upon the arguments and evidence presented."

Martinez then filed his habeas petition in Del Norte County Superior Court. The court granted Martinez's petition on the ground that the warden had not produced any evidence of a "direct link" and did not accept the warden's characterization of a "direct link" as requiring nothing more than a "straightforward connection." The court found that the warden had submitted reliable, confidential evidence that a Mexican Mafia gang affiliate ordered that inmates protest certain prison policies. However, this evidence did not show a direct link between Martinez and that gang affiliate, given Beeson's concession that the affiliate likely did not appear at Martinez's cell door to give him the

---

[5] In his validation proceedings, Martinez said the disturbance "was a protest to prison conditions, not a gang activity. . . . The 1030s do not show that I was privy to the planning nor [*sic*] execution of said protest, just that I participated." He made a similar contention in his habeas petition below.

order personally.  The court concluded that the warden's position "significantly expands on the [CDCR's] position discussed in recent appellate decisions whereby the CDCR interpreted a 'direct link' as 'encompassing connection that is without interruption or diversion' and 'without intervening agency or step.'  ([*Cabrera I*, *supra*,] 55 Cal.4th [at p.] 690, [*Villa*, *supra*,] 214 Cal.App.4th [at p. 964].)  In this case it is manifest there was an unknown, but intervening agency or step between [Martinez] and the gang affiliate."

The court noted that the warden "apparently concede[d] that there is no evidence that the soon to be validated gang affiliate ever had any direct contact with [Martinez].  Instead, [the warden] assume[s] that the inmate gave directions that must have passed through an unknown number of individuals, apparently orally, and [Martinez] acted on those orders.  But here there is no showing that [Martinez] knew there were 'orders' let alone where any such orders came from or that they came from anyone affiliated with the gang."  The court concluded that the warden did not put forward "some evidence" of a direct link.  It ordered, among other things, that Martinez's validation was void and expunged, that Martinez cease to be housed in the SHU based on that validation and that its ruling be stayed pending the outcome of the CDCR's anticipated appeal.  The warden then filed a timely notice of appeal.

## DISCUSSION

## I.

### *Standard of Review*

We independently review the record and consider issues of law de novo as to whether the warden submitted evidence to the trial court that establishes the requisite "direct link" between Martinez and the Mexican Mafia affiliate "[b]ecause the trial court's findings were based solely upon documentary evidence."  (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 677 [reviewing a trial court's grant of a habeas petition regarding a petitioner's suitability for parole].)  We uphold the warden's validation if it is supported by at least "some evidence."  (*Cabrera II*, *supra*, 216 Cal.App.4th at pp. 1531–1532; see *In re Shaputis*, (2011) 53 Cal.4th 192, 210 [indicating in a parole case that the "some evidence" standard requires " 'only a modicum of evidence' "].)  It is not for us to

8

reweigh the evidence, and the some evidence standard does not allow us to reject the CDCR's reasonable evaluation of the evidence in favor of our own judgment. (*Shaputis*, at p. 210.)

On the other hand, the warden must establish a "rational nexus" between the evidence and his conclusion that it establishes a direct link. (See *In re Lawrence* (2008) 44 Cal.4th 1181, 1226–1227 [parole case applying the "some evidence" standard]). As this court has stated in the parole context, "a determination . . . cannot be predicated merely upon 'a hunch or intuition.' (*Lawrence*, *supra*, 44 Cal.4th at p. 1213.) Or 'guesswork.' (*In re Young* [(2012)] 204 Cal.App.4th [288,] 308.) A determination for which there is no evidentiary support . . . is arbitrary and capricious. It is not rational." (*In re Morganti* (2012) 204 Cal.App.4th 904, 926.)

## II.

### *The Meaning of "Direct Link"*

As we have discussed, to validate Martinez as a gang associate, Pelican Bay officials had to produce at least "three (3) independent source items of documentation indicative of association with validated gang members or associates." (§ 3378, subd. (c)(4).) At least one source item had to "be a *direct link* to a current or former validated member or associate of the gang," which could be a person "validated by the department within six (6) months of the established or estimated date of activity identified in the evidence considered." (§ 3378, subd. (c)(4), italics added.)

We defer to the CDCR's interpretation of the quasi-legislative rules it promulgates, such as section 3378, if the interpretation is not "clearly unreasonable," " 'particularly when the interpretation implicates areas of the agency's expertise.' " (*Cabrera I*, *supra*, 55 Cal.4th 683, 688, 690–691.) In *Cabrera I*, our Supreme Court reversed an appellate court's holding that "direct link," as used in section 3378, required " '*reciprocal (i.e., mutual or two-way) interaction* between the two individuals forming the relationship.' " (*Id.* at p. 690.) Instead, the *Cabrera I* court, concluding that it must defer to the CDCR's proffered interpretation of section 3378 because it was not clearly unreasonable, accepted its definition of "direct link" as one "that is ' "without

9

interruption or diversion" and "without any intervening agency or step," ' " and which could be established by one person, unilaterally, as well as the CDCR's definition of " 'association with validated gang affiliates' (§ 3378, subd. (c)(8)) to mean 'a "loose relationship as a partner, . . . colleague, friend, companion, or ally" with a validated gang affiliate.' " (*Id.* at p. 690.) The court ruled that the CDCR's interpretation of a direct link as requiring only a unilateral connection was not clearly unreasonable, as "nothing in the plain language of section 3378 requires proof the inmate formed a reciprocal or mutual relationship with a validated gang affiliate in order to establish a direct link." (*Id.* at pp. 691–692.) The court remanded the case to the appellate court to determine if a direct link had been established under this definition (*id.* at pp. 692–693), leading to *Cabrera II*.

Since the Supreme Court decided *Cabrera I*, our colleagues in other appellate districts have had occasion to apply the "direct link" requirement. In *In re Fernandez* (2013) 212 Cal.App.4th 1199, the Third Appellate District found a "direct link" based on a confidential debriefing report by a validated gang member who specifically identified Fernandez as a member of the gang functioning as the "section channel" at a prison facility. (*Id.* at pp. 1209–1210.)[6]

Our sister appellate courts have rejected the CDCR's "direct link" contentions when the evidence merely indicated general gang affiliation, rather than a direct connection to a person. In *Villa*, *supra*, 214 Cal.App.4th 954, the CDCR contended it established a "direct link" via the confidential identification by an informant—who was *not* a validated gang member—that Villa had "a position on the 'Mesa' " of the Mexican Mafia. (*Id.* at p. 968.) The Fourth Appellate District held that it was not a "direct link" because the plain language of section 3378, subdivision (c)(4) "indicate[d] that the 'direct link' must be to a person," as opposed to a gang in general. (*Id.* at p. 970; § 3378, subd. (c)(4) ["[v]alidation . . . shall require at least one (1) source item be a direct link to

---

[6] At the same time, the court found that a confidential report regarding another inmate did not show that inmate had engaged in gang activity and, therefore, was inadequate to support validation. (*In re Fernandez*, *supra*, 212 Cal.App.4th at pp. 1212–1214.)

10

a . . . *person* who is validated by the [CDCR] within six (6) months of the established or estimated date of activity identified," italics added].)  The court explained that the "direct link" requirement "prevents the validation process from becoming a tautological exercise.  No inmate can be validated simply by the suggestion that he is involved in a prison gang."  (*Villa*, at p. 970.)

In *Cabrera II*, *supra*, 216 Cal.App.4th 1522, the CDCR argued, just as the warden does here, "that 'direct link is 'a broad, flexible term that does not require anything more than a straight-forward connection.' "  (*Cabrera II*, *supra*, 216 Cal.App.4th at pp. 1536–1537.)  Implicitly rejecting this argument, the Fifth Appellate District applied the definitions for "direct link" and "association with validated gang affiliate" that had been offered by the CDCR and approved by the California Supreme Court in *Cabrera I*, 55 Cal.4th at pages 690–691, which we have already summarized.  (*Cabrera II*, at pp. 1534–1535.)  The *Cabrera II* court ruled that Cabrera's mere possession of photocopies of signed drawings—the artists being validated gang affiliates—did *not* reasonably constitute a direct link between the affiliated artists and Cabrera because there was no "rational nexus" between Cabrera's mere possession of them and the existence of a "direct link" to the artists.  (*Id.* at p. 1540.)  Otherwise, the court reasoned, *any* photocopied drawing might be used to establish a direct link, no matter how many intervening owners the photocopy might have had.  (*Id.* at p. 1539.)

The court continued:  "At oral argument, the following hypothetical was presented to counsel for CDCR.  Suppose an inmate author or artist gives an item to inmate B, who gives it to inmate C, who gives it to inmate D, who gives it to inmate E, who crumples it up and throws it in the prison yard.  Suppose further that Cabrera comes by and says 'what's this' and then picks it up and takes it to his cell.  Counsel for CDCR asserted that, so long as the item was a source item, Cabrera's possession of the item is direct and is sufficient to establish a direct link to the artist.  [¶]  We conclude that Cabrera's possession of part of a gang affiliate's name on a drawing created by that gang affiliate is not some evidence that Cabrera had a loose relationship with the artist that formed a connection between Cabrera and the artist that was without interruption or any

11

intervening agency or step. [¶] To satisfy the some evidence test, there must be 'a rational nexus' between the evidence presented and the findings of fact. (*In re Lawrence*, *supra*, 44 Cal.4th at p. 1227.) The gap between the evidence and the findings cannot be bridged 'merely by a hunch or intuition.' (*Id*. at p. 1213.)" (*Cabrera II*, *supra*, 216 Cal.App.4th at p. 1539.)

### III.

### *Analysis*

The warden's argument that we should reverse the superior court is unpersuasive in light of the evidence it has put forward. We agree with much of the warden's discussion of the law. That said, much as the CDCR did in *Cabrera II*, the warden has attempted here to fill a critical evidentiary gap—that between Martinez's participation in the disturbance and the order given by the validated Mexican Mafia affiliate gap—with impermissible hunch and intuition.

Not all of the warden's characterizations of the law are entirely accurate. The warden, while not renouncing the definitions for "direct link" that the CDCR advocated and the Supreme Court approved in *Cabrera I*, attempts to expand those definitions. He contends, as the CDCR did in *Cabrera II*, that a "straight-forward connection" is all that is required and cites *Cabrera II* as authority for this proposition. However, the *Cabrera II* court merely recited the CDCR's "straight-forward connection" argument, and neither adopted it as an alternative definition of "direct link" nor applied it in that case. (*Cabrera II*, *supra*, 216 Cal.App.4th at pp. 1536-1537.) Instead, it acknowledged the definitions of "direct link" offered by the warden's own agency—the CDCR—and adopted by our high court, and applied those definitions, i.e., " ' " 'without interruption or diversion' " ' " and " ' " 'without intervening agency or step,' " ' " to the facts before it. (*Id.* at pp. 1534–1535; *Cabrera I*, *supra*, 55 Cal.4th at p. 690.)

The warden also attempts to disassociate the CDCR from the "direct link" definitions the CDCR itself fought for in *Cabrera I*, contending that the appellate courts have followed these definitions based on a mere "dictionary definition" of "direct." This is misleading, to say the least. Again, our Supreme Court approved these definitions for

12

"direct link" in *Cabrera I as proffered by the CDCR.* (*Cabrera I*, *supra*, 55 Cal.4th at p. 690 [referring to the "*CDCR's* definition of 'direct link' (§ 3378, subd. (c)(4)) as encompassing a connection that is ' "without interruption or diversion" and "without any intervening agency or step," ' " italics added]. ) The warden neither renounces these definitions nor gives us reason to deviate from them. To the extent the warden intends to imply by his reference to "straight-forward connection" that we should expand the boundaries of "direct link" beyond those his own agency advocated and our highest court endorsed in *Cabrera I*, we decline to do so, just as the Fifth Appellate District declined to do in *Cabrera II*.

Indeed, such an expansive "interpretation" of direct link would render that distinct requirement of the CDCR regulations meaningless, since almost any source item could be characterized as having a "straight-forward connection" with a gang member or associate. Gang symbols, such as tattoos, for example, arguably would communicate one's gang affiliation to, among others, gang members and associates. (See *Cabrera I*, *supra*, 55 Cal.4th at 692 [noting gang expert's statement that "a gang affiliate may collect or keep a copy of [drawings or photos containing coded and hidden messages] to demonstrate his association with [a] validated gang member or associate"].) The direct link element requires more.

Also, the CDCR's court-approved interpretation of "direct link" advances the agency's stated goal of ensuring that an inmate meets the definition of an associate, i.e., "an inmate/parolee or any person who is *involved* periodically or regularly with *members or associates* of a gang." (§ 3378, subd. (c)(4), italics added.) Requiring a "direct link" between the inmate and a particular gang member or associate ensures this involvement must be established before an inmate is subjected to the adverse consequences that flow from validation as a gang associate, such as segregated housing and loss of good time credits. It ensures that an "association with validated gang affiliates" as defined by the CDCR (§ 3378, subd. (c)(8))—i.e., " ' "a 'loose *relationship* as a partner, . . . colleague, friend, companion, or ally' with a validated gang affiliate" ' " (*Cabrera II*, *supra*, 216 Cal.App.4th at p. 1535)—in fact exists.

13

Instead, we apply the definitions of "direct link" as advanced by the CDCR and accepted by our high court in *Cabrera I*. Upon doing so, we conclude that the warden's evidence does not establish a direct link between Martinez and the Mexican Mafia affiliate. It arguably establishes at most[7] that Martinez participated in a June 26, 2006 disturbance that, as Agent Beeson characterized it, "was as a result of him receiving, verifying, and acting upon the orders of the [Mexican Mafia] prison *gang*." (Italics added.) As Beeson stated, such orders "trickle down" to persons like Martinez. Thus, this characterization of the evidence by Beeson, who validated Martinez, demonstrates that there is no evidence of any direct link between Martinez and the Mexican Mafia affiliate. Similar to Cabrera in *Cabrera II*, the Mexican Mafia affiliate could have given his order to inmate B, who in turn could have given it to inmate C, who could have given it to inmate D, who could have told Martinez there was a Mexican Mafia gang order—otherwise unidentified—that all Southern Hispanics were to participate in the disturbance. This is insufficient to show a direct link between Martinez and the validated Mexican Mafia affiliate identified by Pelican Bay officials, which is necessary to validate Martinez as a Mexican Mafia associate. Instead, it indicates the possibility—and even the probability—that any order obtained by Martinez that originated with the Mexican Mafia affiliate involved an intervening agency or step.

Rather than acknowledge this evidentiary gap, the warden mischaracterizes Beeson's characterization of the evidence and his conclusion, stating that "Beeson

---

[7] We review the record for some evidence in support of the decision to validate Martinez as a Mexican Mafia gang associate, which by definition must be evidence that existed at the time of his validation in December 2011. Although Beeson is the person who validated Martinez, it is questionable whether some of the statements in Beeson's declaration constitute such evidence. Beeson executed his declaration three years after Martinez was validated, in opposition to Martinez's habeas petition in superior court. Thus, the declaration itself was not evidence relied on to validate Martinez. Also, many of Beeson's statements characterize the evidence, but are not evidence themselves. In any event, even if we treated Beeson's entire declaration as evidence of the facts upon which the decision to validate Martinez was made, the declaration fails to establish a direct link. Thus, we need not further address the extent to which the declaration is competent evidence.

concluded, based on his training, knowledge, and experience, that given these facts, Martinez participated in the mass disturbance as a result of his receiving, verifying, and acting upon *a validated associate's order*." (Italics added.) This was not Beeson's conclusion, nor what was shown by the evidence. Again, Beeson concluded, based on his training, knowledge and experience, that the evidence before him indicated that Martinez participated in June 26, 2006 disturbance "as a result of him receiving, verifying, and acting upon the orders of *the [Mexican Mafia] prison gang*." (Italics added.) Beeson viewed this evidence as "constituting a direct link to the validated [Mexican Mafia affiliate] who gave the order." This, however, is a legal question that we answer de novo. As indicated by the discussion and holding of *Cabrera II* and *Villa*, *supra*, 214 Cal.App.4th 954, the evidence does not constitute such a direct link.

## DISPOSITION

The trial court's grant of Martinez's petition for a writ of habeas corpus is affirmed.

STEWART, J.

We concur.

RICHMAN, Acting P.J.

MILLER, J.

15

Trial Court:    Del Norte County Superior Court

Trial Judge:    Hon. William H. Follett

Counsel:

Kamala D. Harris, Attorney General, Jennifer A. Neill, Senior Assistant Attorney General, Jessica N. Blonien, Supervising Deputy Attorney General, Maria G. Chan, Deputy Attorney General, for Respondent.

L. Richard Braucher, under appointment by the Court of Appeal, for Petitioner.