Filed 6/25/20

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| NICHOLAS HONCHARIW, as Trustee, etc.,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>COUNTY OF STANISLAUS et al.,<br><br>    Defendants and Respondents. | F077815<br><br>(Super. Ct. No. 2026470)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Stanislaus County.  Marie Sovey Silveira, Judge.

Nicholas Honchariw, in pro. per., for Plaintiff and Appellant.

Shute, Mihaly & Weinberger, Matthew D. Zinn, Aaron M. Stanton; John P. Doering, County Counsel, and Thomas E. Boze, Assistant County Counsel, for Defendants and Respondents.

-ooOoo-

Plaintiff Nicholas Honchariw appeals from a judgment denying his petition for writ of mandate.  In 2012, the Stanislaus County Board of Supervisors (Board) approved, subject to conditions, Honchariw's application for a vesting tentative map for a small

---

[*]    Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part III. of the Discussion.

subdivision he is attempting to develop. On appeal, he contends the trial court misinterpreted the conditions placed on the approved vesting tentative map. The court interpreted the conditions to require a fire suppression system, with functional fire hydrants to be in place, before the County of Stanislaus (County) would approve the final subdivision map.

In the published portion of this opinion, we address County's statute of limitations defense and conclude Honchariw's claims of misinterpretation are not barred by the 90-day period set forth in Government Code section 66499.37.[1] A claim of misinterpretation is distinct from a claim challenging the validity of the condition of approval and the two types of claims accrue at different times. In the unpublished portion of this opinion, we set forth the legal principles that guide the interpretation of conditions of approval and apply those principles to determine the meaning of the conditions addressing water supply and fire suppression. Although we conclude County has misinterpreted the conditions of approval, we cannot set forth all the actions County must take under the proper interpretation because there remain unresolved questions of fact for which the record contains conflicting evidence. Consequently, on remand the trial court must resolve those questions before determining the final terms of the writ of mandate. At a minimum, however, the writ shall direct County and its officials to interpret the conditions of approval as set forth in this opinion.

We therefore reverse the judgment and remand for further proceedings.

## FACTS

Honchariw, in his capacity as trustee for the Honchariw Family Trust, proposed dividing a 33.7-acre parcel of land in the Knights Ferry area of Stanislaus County into eight residential lots and one undeveloped parcel. The proposed residential lots consist of four one-acre lots, three five-acre lots, and a half-acre lot. The half-acre lot contains a

---

[1] All unlabeled statutory references are to the Government Code.

2.

dwelling, obtains water service from the Knights Ferry Community Services District (KFCSD), and has a private septic tank. The parcel's eastern boundary is the Stanislaus River, its northern boundary is Cemetery Road, and its western and southwestern boundary is Frymire Road. The parcel was acquired by Reverend Iwan S. Honchariw in 1973 and placed in the Honchariw Family Trust in 1991, the year before he died. The beneficiaries of the trust are Reverend Honchariw's nieces and nephews. Honchariw has been the sole trustee since 1992 and is not a beneficiary of the trust. He intends to have the trust retain the riverfront portion of the property, which had been used by the extended family for decades as a retreat.

As part of his proposal to subdivide the 33.7-acre parcel, Honchariw submitted vesting tentative map application No. 2006-06 to County's planning commission in 2006. The planning commission denied Honchariw's application. He filed an administrative appeal and the Board voted to disapprove the application.

Honchariw filed a petition for writ of mandamus challenging the Board's decision. The superior court denied his petition. In November 2011, we reversed the superior court's judgment and ordered the court to issue a writ of mandate directing the Board to vacate its denial of Honchariw's vesting tentative map application, reconsider the application, and make certain determinations and findings in the event that it again denied the application. (*Honchariw v. County of Stanislaus* (2011) 200 Cal.App.4th 1066, 1081–1082.)[2]

The process of reconsidering Honchariw's application included County's planning and community development department preparing a May 15, 2012, action agenda summary for the Board. The action agenda summary stated a core issue was the source

---

[2]    Subsequent disputes between County and Honchariw produced two other published opinions. (*Honchariw v. County of Stanislaus* (2015) 238 Cal.App.4th 1 [inverse condemnation action barred by 90-day statute of limitations]; *Honchariw v. County of Stanislaus* (2013) 218 Cal.App.4th 1019 [affirmed denial of attorney fees].)

of water service for the four contiguous one-acre lots. These lots were within the boundaries of KFCSD. The summary stated the water source would be public water provided by KFCSD. County staff met with KFCSD to discuss KFCSD's ability to provide water and was told the water capacity to serve the four lots was available, but the necessary infrastructure to provide service was not in place. The action agenda summary stated:

> "As such, any water connection provided by the KFCSD to the applicant's site, will require the applicant to install the necessary infrastructure to extend the KFCSD's water service. In a recent letter, dated May 3, 2012, the KFCSD indicated that the applicant will need to file a formal application with [KFCSD] to explore current conditions and determine the type of water system improvements needed, in order to provide water to the project site (see Attachment '8'). Conditions of Approval have been added to reflect [KFCSD's] application and water system connection requirements. If this project is approved, actual improvements and associated costs will be the sole responsibility of the applicant and will be required to be in place prior to recording the [vesting tentative map]."

The action agenda summary also addressed the fire-flow requirement previously included when Honchariw's application had been circulated in 2007 and 2008. It stated that a specific condition of approval had been removed from the revised conditions of approval and stated the Oakdale Irrigation District has been contacted and informed of staff's recommendation to remove the condition. In addition, the summary stated:

> "The project in its present form, will be obtaining water for domestic use and fire protection from the KFCSD. Any fire flow requirements will be handled through the building permit process and at the time of construction, as required under the California Fire Code."

The subject of fire hydrants and water supply was discussed at the Board's May 15, 2012, meeting. An excerpt from the transcript of that meeting includes the following exchange between a supervisor and the director of County's planning and community development department:

4.

"SUPERVISOR DeMARTINI: Yes, Mr. Chairman, I just wanted to go back to this fire suppression, because I just went through that with our fire department, but … looking at condition 40, its says fire hydrants shall be extended to serve any new structures in the parcels, and then stuff about how they can't be any further than a thousand feet from the fire hydrant. [¶] I mean, that's one of the conditions. [¶] And the question I had is does the [Knights Ferry] Community Service District have sufficient water? Because it's going to take a larger line for the fire hydrant.

"ANGELA FREITAS: If I may. [¶] Part of Condition of Approval No. 24 is that the applicant study both or work with [KFCDS] to study both domestic and fire suppression. [¶] So the ultimate designs of this project to move forward would require hydrants for fire suppression, and they would have to install a line that's adequate enough to supply those fire hydrants.

"SUPERVISOR DeMARTINI: I just want to be sure I understand this. These are fire hydrants that are coming from water—from [Knights Ferry] Community Service District, not from, say, buried tanks?

"ANGELA FREITAS: Correct.

"SUPERVISOR DeMARTINI: Okay. I take, then, that [Knights Ferry] Community Service District would be able to do that? [¶] If they had the line engineered, they would have sufficient water and pressure?

"ANGELA FREITAS: Correct. [¶] As Condition No. 24, they'll have to—they'll have to address that in the design."

A representative of KFCSD then addressed the Board, stating (1) the district had enough water to serve the residential demand and (2) the fire suppression would have to be engineered and would have to comply with federal, state and county regulations. In closing, the representative stated: "That has all yet to be determined. [¶] We have to get an application for this project and we have to have an investigation. We have to have it all engineered so we know exactly where we stand, before we can say yes or no. Thank you."

On May 16, 2012, Honchariw held a conference call with County's lead staffer on the application, assistant county counsel, and someone from County's department of

5.

public works.  Honchariw's contemporaneous handwritten notes from the conference call included the following item:  "(3)  Fire Suppression—arises at bldg. permit stage

On May 22, 2012, the Board approved Honchariw's vesting tentative map application No. 2006-06, subject to 42 conditions of approval.  Condition Nos. 24, 25, 26 and 40 are relevant to this appeal and read as follows:

"24. Prior to recording the 'Final' Subdivision Map, the applicant shall contact the [KFCSD] and submit a written application to obtain water service (domestic & fire suppression) for all lots within the Community Services District boundaries, in accordance with all applicable KFCSD rules, regulations, standards, and ordinances, and shall cause all public improvements required by KFCSD to be completed and accepted for public use.

"25. Prior to recording the 'Final' Subdivision Map, water service provided by the Knights Ferry Community Services District, shall be established, constructed, and operational for the four (4) proposed 1-Acre Lots, identified as being Lots No. 4-7 on the Tentative Subdivision Map, and the designated 'Remainder' parcel.

"26. If, at the time of approval of the final map, any public improvements required by a local agency, including without limitation the Knights Ferry Community Services District, have not been completed and accepted in accordance with standards established by the local agency by ordinance applicable at the time of the approval or conditional approval of the tentative map, the applicant shall enter into a Subdivision Improvement Agreement in compliance with Government Code § 66462.  [¶] … [¶]

"40. Fire hydrants shall be extended to serve any new structures, on parcels within the Community Services District boundaries, with no structure residing further than 1000 feet from a hydrant or as required by Knights Ferry Community Services District ordinance, whichever provides a higher level of fire protection."

Honchariw's opening brief contends he submitted a request for water service to KFCSD in accordance with condition No. 24 and secured a "will serve letter" dated January 22, 2016.[3]  His declaration states he "secured a conditional will serve letter and

---

[3]     In comparison, a May 5, 2017 e-mail from Honchariw mentioned a January 16, 2016 will serve letter and asserted a June 15, 2016 will serve letter referred to by the

6.

reached the outlines of an agreement with KFCSD for the water line extension, including primary and back-up booster pumps to supply water uphill to the 1-acre lots, together with a stainless steel pressurized storage tank to avoid or minimize drain upon the remainder of the system." Honchariw's declaration also stated KFCSD requested the booster pumps to be limited to 60 gallons per minute to avoid taxing the system.

On the subject of new fire hydrants, KFCSD expressed concern that installing hydrants on the new waterline would be a representation that adequate fire protection was available. At the time, KFCSD's water plant was not capable of delivering fire protection flows to its existing system. Consequently, KFCSD stated hydrants must not be installed until it is able to modify its plant to provide fire protections flows. Honchariw's declaration stated KFCSD requested he install risers for future connections instead of installing hydrants. The risers would allow the hydrants to be bolted onto the system in the future. Honchariw asserts he reached an agreement with KFCSD for an engineered six-inch water line extension with a 60-gallon per minute booster pump (with back-up pump) and a pressurized 2,000-gallon storage tank.

Honchariw's declaration asserts he submitted a proposed final subdivision map to County in April 2016 and, soon thereafter, submitted plans and specifications prepared by his civil engineers in accordance with KFCSD's requests. In response, County's department of public works sent Honchariw's engineers a November 22, 2016 plan review letter stating it could not approve the proposed plans for the water system without further information about 14 items. Items 9 and 10 addressed the fire hydrants. Item 9 stated "the minimum size pipe used for the water mains shall have a nominal diameter of 8 inches. In addition, all water mains shall be sized to provide 1,000 gallons per minute fire flow from each of 2 adjacent fire hydrants flowing simultaneously to 20 [pounds per

department of public works was a nullity. None of the three letters is included in the appellate record.

7.

square inch] residual pressure." The item requested calculations showing the pressure and flow conditions were met. Item 10 stated "fire hydrants shall be fed from two directions unless specifically approved by the fire department" and requested a letter of approval from the fire department.

Based on the request for water mains with an 8-inch diameter, Honchariw's engineers ran calculations showing the main extension of that size would meet the pressure and flow requirements upon an upgrade of KFCSD's system. Because the lots formed a cul-de-sac, the engineers believed the lots qualified for an exemption to the requirement that hydrants be fed from two directions.

At a March 29, 2017 meeting with the department of public works, Honchariw was informed his proposed plans did not comply with the conditions of approval. The department expressed the view that development projects were required to meet the Fire Code flow and pressure standards for 1,000 gallons per minute with 20 pounds per square inch of residual pressure for a hypothetical design fire with a two-hour duration. Furthermore, the department interpreted the conditions of approval as requiring a fire suppression system based on *functional* fire hydrants or, alternatively, other fire suppression arrangements with the Stanislaus County Fire Marshall.

Honchariw contends the interpretation of the conditions of approval as requiring functional fire hydrants came at him out of the blue because KFCSD's substandard system could not supply the required flows. Under this interpretation, it was left to Honchariw to supply the required flows. Honchariw describes the fire suppression system now being required as overkill and municipal-sized, arguing the high, front-loaded cost of such a system is prohibitive and has brought the project to a halt.

Honchariw sought to meet with County employees to arrange an agreeable way to proceed. Honchariw and the department of public works exchanged correspondence in June and July of 2017. A July 6, 2017 e-mail from the department of public works

addressed whether Honchariw had a will serve letter from KFCSD. The e-mail referred to a January 24, 2016 letter[4] signed by Honchariw but not KFCSD and stated:

"This letter is not a Will Serve letter, it clearly states it serves to notify [Honchariw] of KFCSD's conditional intent to issue a 'Will Serve Letter'. It appears to me that KFCSD issues a 'conditional intent' letter specifying what is required of a project in order to obtain a 'Will Serve' letter. The Developer indicates his agreement to the requirements via his signature on the 'conditional intent' letter. The actual 'Will Serve' letter is issued at a later date."

KFCSD's requirements for the subdivision project were addressed indirectly in a July 12, 2017 e-mail from counsel for KFCSD to the department of public works and Honchariw. The e-mail stated "the most recent draft of the Developer Agreement between KFCSD and Mr. Honchariw" was attached. The second numbered paragraph of the draft developer agreement stated: "KFCSD hereby accepts Developer's improvement plans for the water system prepared by Giuliani & Kull dated April 14, 2016, and submitted to Stanislaus County for review, subject to the changes required by Stanislaus County." The e-mail stated the agreement was not signed by KFCSD because "it was our understanding that Mr. Honchariw was still working with the County/Fire Marshall regarding the fire suppression system as KFCSD's water supply is not adequate to insure proper fire suppression as set forth in the draft Development Agreement."

Honchariw's July 17, 2017 e-mail to KFCSD's counsel and the department of public works asserted "the Developer Agreement is our agreement with KFCSD, which we put aside pending resolution of hydrants / fire suppression with the County." Honchariw stated he was "prepared to install hydrants now or simply stub them, as drawn, until permitting and construction." Honchariw set forth his interpretation of the conditions of approval, stating:

---

[4]    This letter might be the one Honchariw's opening brief states is dated January 22, 2016. (See fn. 3, *ante*.)

9.

"We can defer installation without any modification or waiver of our Conditions. The hydrant requirement is not found in the KFCSD line extension requirements specified in Conditions #24 – 26, which require that the extension must be completed and operational before a final map can be recorded, but Condition #40, which simply requires that hydrants be 'extended to serve new structures'.

"This dovetails with fire suppression requirements, including the fire flow requirements, which are tied to new structures. There are no structures now, and there will be no new structures until permitting and construction, well after recordation of the final map, possibly years. Some lots may never get structures, eg, lots merged by a buyer. Hydrants can be installed as part and parcel of the determination of fire suppression measures upon permitting and construction."

The department of public works sent two e-mails on July 24, 2017, that disagreed with Honchariw's interpretation of the conditions of approval. The department reiterated its view that "the Conditions of Approval require the Developer to install a fire suppression system based on functional fire hydrants"—something the draft developer agreement did not require. The e-mail to Honchariw stated the department's staff would be happy to meet with Honchariw *after* submission of plans for a fire suppression system based on functional fire hydrants—that is, hydrants meeting the fire flows for volume and pressure required by the Fire Code. The e-mail also stated (1) KFCSD had been very clear in its correspondence that it could not supply fire flows directly from their current system and had no plans for system improvements to meet those flows; (2) it was up to Honchariw to solve the water supply problem in order to complete his subdivision; and (3) Honchariw could provide the necessary water from (a) a new well, (b) a surface water supply, or (c) a tank.

Each side remained steadfast in its position, with Honchariw contending a functional fire suppression system was not required for approval of a final map and, instead, could be built out as the lots were developed. Having reached an impasse with County, Honchariw turned to the courts.

10.

On August 25, 2017, Honchariw filed a petition for writ of mandate and complaint for damages alleging County's demand for a fire suppression system with functional fire hydrants violated his vested rights. In November 2017, the trial court held a hearing on the petition. County argued common sense applied to an interpretation of the conditions of approval and common sense dictated that the water system and fire hydrants be functional, not ornamental. Honchariw argued that the plain and ordinary meaning of the wording of the conditions of approval should be applied. Under Honchariw's reading of the conditions of approval, a functional fire suppression system would be built out as the property was developed.

In February 2018, the trial court filed a proposed statement of decision denying the petition for a writ, the request for injunction, and the request for other relief. In March 2018, after submission of written responses to the proposed decision, the court issued a statement of decision denying the petition.

On May 22, 2018, the court issued a judgment in favor of County that denied the petition for writ of mandate and denied all relief sought in the complaint for declaratory relief and damages. Honchariw timely appealed.

**DISCUSSION**

I.      OVERVIEW OF VESTING TENTATIVE MAPS

The Subdivision Map Act (§§ 66410–66499.38) requires local agencies, such as County, to regulate and control the design and improvement of subdivisions. (§ 66411.) The goal of local review and approval of proposed subdivisions is to " 'control the design of subdivisions for the benefit of adjacent landowners, prospective purchasers and the public in general.' " (*Gardner v. County of Sonoma* (2003) 29 Cal.4th 990, 997.) Specifically, the statute "seeks 'to encourage and facilitate orderly community development, coordinate planning with the community pattern established by local

11.

authorities, and assure proper improvements are made, so that the area does not become an undue burden on the taxpayer.' " (*Id*. at pp. 997–998.)[5]

Under the Subdivision Map Act, each local agency must enact an ordinance to regulate and control the initial design and improvements of all subdivisions where tentative and final maps are required by the statute. (§ 66411.) A tentative and final map is required for Honchariw's proposed subdivision because it creates five or more parcels. (§ 66426.) A tentative map shows "the design and improvement of a proposed subdivision and the existing conditions in and around it and need not be based on an accurate or detailed final survey of the property." (§ 66424.5, subd. (a).)

A subdivider may file a "vesting tentative map" whenever the Subdivision Map Act requires a tentative map. (*Bright Development v. City of Tracy* (1993) 20 Cal.App.4th 783, 792.) The vesting tentative map statute[6] was enacted to "establish a procedure for the approval of tentative maps that will provide certain statutorily vested rights to a subdivider" (§ 66498.9, subd. (a)) and to "insure that local requirements governing the development of a proposed subdivision are established in accordance with Section 66498.1 when a local agency approves or conditionally approves a vesting tentative map." (§ 66498.9, subd. (b).) The Legislature declared that "[t]he private

---

[5] Other aspects of protecting prospective buyers are addressed in the Subdivided Lands Act (Bus. & Prof. Code, §§ 11000–11200.) Generally, lots in a subdivision cannot be sold without providing the prospective buyer with a "public report" issued by the Bureau of Real Estate. (Bus. & Prof. Code, §§ 11010, subd. (a); see generally, 8 Miller & Starr, Cal. Real Estate (4th ed. 2019) Subdivision Offerings, Sales, and Leasing, §§ 29:13-29:32, pp. 29-56 to 29-112 [application and issuance of public reports].) "The purpose of the report is to provide accurate information to the purchaser or lessee so that he or she may make an informed decision regarding the transaction." (*Id*., § 29:14, p. 29-58.) During oral argument, Honchariw acknowledged that the proposed subdivision was subject to the disclosure requirements of the Subdivided Lands Act.

[6] This statute is chapter 4.5 of the Subdivision Map Act and consists of sections 66498.1 through 66498.9. (See Stats. 1984, ch. 1113, § 8, pp. 3744–3746 [§§ 66498.1– 66498.7]; Stats 1985, ch. 259, § 2, p. 1269 [§ 66498.8]; Stats. 1986, ch. 613, § 5, p. 2114 [§ 66498.9].)

sector should be able to rely upon an approved vesting tentative map prior to expending resources and incurring liabilities without the risk of having the project frustrated by subsequent action by the approving local agency ….." (§ 66498.9, subd. (b).) The vesting tentative map statute was "enacted in response to the erosion of the common law doctrine of vested rights." (*Bright*, *supra*, at p. 793.) Under the statute, when a local agency considers an application for a tentative map, it shall apply only those ordinances, policies and standards in effect when the vesting tentative map application is deemed complete, unless certain exceptions apply. (§ 66474.2, subd. (a); see *Bright*, *supra*, at p. 793.)[7] "When a local agency approves or conditionally approves a vesting tentative map, that approval shall confer a vested right to proceed with development in substantial compliance with the ordinances, policies, and standards described in Section 66474.2." (§ 66498.1, subd. (b).) The statute does not explicitly address how to interpret conditions of approval.

## II.     STATUTE OF LIMITATIONS

County contends that, to the extent Honchariw is challenging the conditions of approval imposed in 2012, the challenge is barred by the statute of limitations. The statute of limitations in question is the 90-day period set forth in section 66499.37, which provides in part:

> "Any action or proceeding to attack, review, set aside, void, or annul the decision of an advisory agency, appeal board, or legislative body concerning a subdivision, or of any of the proceedings, acts, or determinations taken, done, or made prior to the decision, or to determine the reasonableness, legality, or validity of any condition attached thereto, including, but not limited to, the approval of a tentative map or final map, shall not be maintained by any person unless the action or proceeding is

---

[7]     "[A] final map shall be disapproved only for failure to meet or perform requirements or conditions which were applicable to the subdivision at the time of approval of the tentative map." (§ 66473.) A disapproval of a final map "shall be accompanied by a finding identifying the requirements or conditions which have not been met or performed." (§ 66473.)

commenced and service of summons effected within 90 days after the date of the decision. Thereafter all persons are barred from any action or proceeding or any defense of invalidity or unreasonableness of the decision or of the proceedings, acts, or determinations ….” (§ 66499.37.)

This provision covers lawsuits challenging a variety of decisions by the local agency and lawsuits “to determine the reasonableness, legality, or validity of any condition attached” to a decision about a subdivision. (§ 66499.37.) Here, Honchariw’s main issue is not with the reasonableness, legality or validity of any of the conditions of approval adopted in May 2012. Instead, he contends the County has misinterpreted and misapplied the conditions of approval. The alleged misinterpretation and misapplication qualify, for purposes of the statute of limitations, as an “act[] or determination[] taken, done or made prior to the decision” of an agency “concerning a subdivision.” (§ 66499.37.) More specifically, *the interpretation of the conditions of approval* set forth in the June and July 2017 correspondence of the department of public works is the act or determination being challenged in this lawsuit.

Here, Honchariw filed his petition and complaint on Friday, August 25, 2017. As a result, the 90-day limitation period encompasses acts and determinations made on or after Saturday May 27, 2017. Thus, the petition challenging the interpretation of the conditions of approval set forth in correspondence exchanged in June and July 2017 was within the 90-day limitations period. As a result, we conclude Honchariw’s petition was a timely challenge to the interpretation of the conditions of approval—a challenge that is distinct from a challenge to the validity of a condition of approval.

Stated another way, a claim challenging an agency’s interpretation of a condition of approval does not “accrue” for purposes of the statute of limitations until it is clear what interpretation the agency has adopted and that the interpretation is the agency’s final position—that is, further negotiations or attempts at clarification are unnecessary or would be futile. (See *Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1185, 1191 [generally, a limitation period runs from the moment a claim accrues, which is the

14.

occurrence of the last element of the cause of action].)  Here, the County's final position was established in June or July 2017, rendering further negotiation or attempts at clarification unnecessary.  Accordingly, the statute of limitations does not bar Honchariw's claims.

III.    INTERPRETING THE CONDITIONS OF APPROVAL[*]

The parties' dispute over the meaning of the conditions of approval presents a series of questions.  Initially, we conclude the interpretation of conditions of approval of a vesting tentative map is governed by the general principles for the construction of written instruments modified to account for the purposes of the Subdivision Map Act, including the particular purposes of the vesting tentative map statute.  Under these principles, the conditions of approval must be given an objectively reasonable interpretation to protect the reasonable expectations of the applicant obtaining conditional approval of a vesting tentative map.  In this case, the conditions of approval, as drafted, do not explicitly address when the fire hydrants must be functional.  Furthermore, the level of water service for fire suppression is addressed by the condition requiring Honchariw to "cause all public improvements required by" the KFCSD "to be completed and accepted for public use" prior to recording the final map addresses.  This language implies that the public improvements required by KFCSD will determine the flow and pressure requirements needed to make the fire hydrants functional.  The question of what public improvements KFCSD requires was not reached in the statement of decision and that issue cannot be resolved on appeal because the record contains conflicting evidence.  Consequently, those questions must be resolved on remand before the final terms of the writ of mandate are determined.  At a minimum, the writ shall direct County and its officials to interpret the conditions of approval as set forth in this opinion.

---

[*]    See footnote, *ante*, page 1.

15.

A.       Applicable Rules of Interpretation

Our resolution of the parties' dispute about how to interpret the conditions of approval begins by identifying the legal principles governing that interpretation.  We conclude the general principles for construing written instruments apply, provided that those general principles do not undermine the purposes of the Subdivision Map Act or the particular purposes of the vesting tentative map statute.  (Cf. *Verner v. Verner* (1978) 77 Cal.App.3d 718, 724 [meaning of a court's judgment or order determined under rules governing the interpretation of writings generally].)

The first step in our analysis of the meaning of the conditions of approval is to determine whether the language used was ambiguous—that is, reasonably susceptible to more than one meaning.  This is a familiar step because it is routinely taken by courts determining the meaning of written documents, such as statutes and contracts.  (See *Gutierrez v. Carmax Auto Superstores California* (2018) 19 Cal.App.5th 1234, 1249 [first question of statutory interpretation is whether the statute's language is ambiguous]; *Smith v. Adventist Health System/West* (2010) 182 Cal.App.4th 729, 754–755 [court's threshold question when interpreting a contract is whether the writing is ambiguous]; *Adams v. MHC Colony Park, L.P.* (2014) 224 Cal.App.4th 601, 619 [same]; see *Estate of Newmark* (1977) 67 Cal.App.3d 350, 355 ["ambiguity exists in a written instrument when its language is properly susceptible to multiple constructions"].)  Generally, whether language is ambiguous presents a question of law.  (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165.)  As a question of law, it is subject to independent review on appeal.  (*Adams v. MHC Colony Park, L.P.*, *supra*, at p. 619.)

If we determine a condition of approval is not ambiguous—that is, the language is reasonably susceptible to only one interpretation—our inquiry into meaning has reached its end and the plain meaning of the wording of the condition of approval governs.  (See *Scheenstra v. California Dairies, Inc.* (2013) 213 Cal.App.4th 370, 390 [contractual language].)  Alternatively, if there is an ambiguity, our inquiry into meaning continues

16.

and we must resolve the ambiguities. (*Ibid*.) To define the scope of that inquiry, we must identify the circumstances properly considered by a court resolving an ambiguity in a condition of approval.

A fundamental principle for determining meaning holds that the language used in a contract, statute, regulation or rule is best understood in context, with the whole of the written language being considered when attempting to construe a particular part. (Civ. Code, § 1641 [contract must be read as a whole]; *Superior Court v. Public Employment Relations Bd.* (2018) 30 Cal.App.5th 158, 188 [statutes and regulations].) We conclude this principle applies to the conditions of approval. Furthermore, we conclude conditions of approval, like a contract, " 'must be understood with reference to the circumstances under which it was made and the matter to which it relates. (Civ. Code, § 1647.)' " (*Mountain Air Enterprises, LLC v. Sundowner Towers, LLC* (2017) 3 Cal.5th 744, 752.)

We note that certain written documents created by agencies—specifically, quasi-legislative administrative rules—are subject to very limited judicial review. (*In re Cabrera* (2012) 55 Cal.4th 683, 687.) This level of deference is not appropriate for the interpretation of vesting tentative map's conditions of approval. To promote the purposes of the Subdivision Map Act, we will resolve any ambiguity in the conditions of approval in a manner consistent with the objectively reasonable expectations of the applicant. An approach that fails to protect the objectively reasonable expectations of the applicant would undermine the purpose of the vesting tentative map statute. (See § 66498.9, subd. (b) ["private sector should be able to rely upon an approved vesting tentative map prior to expending resources and incurring liabilities without the risk of having the project frustrated by subsequent action by the approving local agency"].) In other words, we are not bound to accept the local agency's interpretation of a condition of approval simply because that interpretation is one of multiple reasonable interpretations.[8] Such an

---

[8] The statement of decision stated (1) a writ a mandate cannot be used to control the discretion of an administrative agency or officer; (2) "[b]ecause the local government has

17.

approach would reward local agencies that draft ambiguous conditions of approval by giving them flexibility not conferred by clearly drafted conditions.

B.     Condition No. 40

### 1.     *Language of the Condition*

Condition No. 40 provides:  "Fire hydrants shall be extended to serve any new structures, on parcels within the Community Services District boundaries, with no structure residing further than 1000 feet from a hydrant or as required by Knights Ferry Community Services District ordinance, whichever provides a higher level of fire protection."

### 2.     *Parties' Contentions as to Meaning*

Honchariw argues the wording of this condition (1) does not require the installation of hydrants on or before *approval* of the final map, (2) does not require installation or operation before *recordation* of a final map, and (3) sets no explicit deadline for the installation of hydrants.  Honchariw also points out that the structures referred to in the condition will not exist until a final map is approved and recorded, the lots are sold, and the lot buyers have obtained the necessary permits to construct buildings on the lots.  Honchariw's opening brief repeatedly states that "fire flows for the lots would be determined at the time of permitting and construction of new structures."

duties and responsibilities in the approval of subdivision projects, it is required to exercise, carefully, its approval of a Final Map"; and (3) "[t]here has been no abuse of discretion here."  These statements create the impression the trial court determined County personnel were exercising discretionary authority when interpreting the conditions of approval.  Any such determination would have been legal error.  First, it contradicts the rules of interpretation set forth in Part III.A., *ante*.  Second, agency's typically exercise their discretion when imposing the conditions of approval, not when interpreting the conditions to determine whether to approve a final map.  (See Cal. Code Regs., tit. 14, § 15268, subd. (b)(3) [approval of final subdivision map is presumed to be ministerial, not discretionary].)

In comparison, County points to the phrase stating that "hydrants shall be extended to serve any new structures" and argues the only common sense reading of this language is that fire hydrants intended to "serve" new structures must be fire hydrants that are fully functional. In County's view, a nonfunctional fire hydrant would not serve anything. County asserts that Honchariw has taken the "position that the subdivision need not *ever* be served by the system of functioning hydrants plainly required by the conditions."

### 3. Ambiguity

Initially, to establish some of the foundation for resolving the staunchly contested timing question, we address whether the condition's language is reasonably susceptible to more than one interpretation about the need for *functional* fire hydrants. This question is distinct from the question of *when* the fire hydrants must be provided—a distinction not recognized by County's argument. We conclude the condition's language is not ambiguous on this point and the fire hydrants must be functional. Under the alternate interpretation, the condition would read: "Fire hydrants, *either functional or nonfunctional*, shall be extended to serve any new structures .…" This interpretation is not objectively reasonable because, as pointed out by County, nonfunctional hydrants would not "serve" the purpose of fire protection.

The interpretation that the fire hydrants must be functional does not resolve (1) what "functional" means or (2) the issues raised by Honchariw's argument about timing. Our first step in resolving those issues addresses the legal question of whether the condition's language is ambiguous (i.e., reasonably susceptible to more than one interpretation) about *when* the functional fire hydrants must be provided and *who* determines the level of water service needed to make the hydrants functional.

The language in condition No. 40 does not expressly address timing or who determines the water service needed to make the fire hydrants functional. In the absence

19.

of explicit provisions, we (1) look to the other language in the conditions, (2) consider the inferences reasonably drawn from that language, and (3) determine if those inferences reasonably support more than one interpretation. Based on the inferences discussed below, we conclude conflicting inferences can be drawn from the wording of condition No. 40 and, therefore, the condition is ambiguous as to *when* the functional fire hydrants must be provided and *who* determines the level of water service needed to make the hydrants functional.

### 4. *Resolving the Ambiguity as to When*

The next step of our analysis involves resolving the meaning of the ambiguous provision by selecting the objectively reasonable interpretation of condition No. 40 that best comports with the language used and the applicable principles of construction. We analyze the conflicting interpretations offered by the parties by considering, among other things, how those interpretations fit with a literal reading of the condition's language.

The phrase stating "hydrants shall be extended to serve any new structures" will be satisfied so long as functional fire hydrants capable of serving each new structure are in existence *when the new structure is built*. Thus, read literally, that phrase does not require the hydrants to be in place before the new structures. The minimum required is that the fire hydrants exist when the new structure is built. As a result, we conclude the wording of the phrase is consistent with Honchariw's interpretation—that is, a literal reading does not eliminate Honchariw's interpretation that fire flows from the hydrants is to be determined at the time of permitting. Stated from a different perspective, a literal reading does not compel the adoption of County's interpretation.

The condition's requirement that "no structure resid[e] further than 1000 feet from a hydrant" also supports inferences about when the hydrants must be available. A measurement of the distance between a fire hydrant and a structure cannot be completed until the location of the structure is determined. County has pointed to nothing in the

20.

record showing the location of the houses or any other building on the four one-acre lots will be determined before final map approval and, thus, all the necessary 1000-foot calculations can be made at that time. Accordingly, the need to determine the distance between a structure and a fire hydrant does not imply that a functional fire hydrant must be in place prior to final map approval. Rather, it will be possible to determine compliance with the distance requirement in condition No. 40 (i.e., avoid noncompliance with its literal terms) only after the location of a proposed structure is determined. Therefore, the wording of the distance requirement most strongly supports the inference that the functional fire hydrants must be in place prior to approval of building permits, not prior to approval of the final map.

Our evaluation of the conflicting interpretations offered also considers the ease or difficulty in drafting language that avoids the ambiguity. (See Civ. Code, § 1654 [language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist].) Here, County demonstrated it could draft clear language stating when a condition of approval was to be satisfied. For example, condition Nos. 11 and 20 refer to the payment of fees at the time of, or prior to, issuance of building permits. Also, both condition Nos. 24 and 25 begin with the phrase "[p]rior to recording the 'Final' Subdivision Map .…" It would have been relatively simple for County to include this or similar language in condition No. 40. Because of the ease with which the ambiguity could have been avoided, we conclude it is less reasonable to drawn inferences in favor of County's interpretation. Rejecting such inferences would encourage clear drafting, promote the statutory purpose of providing subdividers certainty (see § 66498.9, subd. (b)), and reduce litigation.

On balance, we conclude the objectively reasonable interpretation of condition No. 40 that best comports with the language used and the applicable principles of construction is the interpretation offered by Honchariw—that is, functional fire hydrants need not be in place to serve new structures until the building permit stage. In the next

21.

sections, we consider (1) whether that interpretation is changed by our analysis of condition Nos. 24 and 25 and (2) who determines the level of water service needed to make the hydrants functional for purposes of satisfying the conditions of approval.

C.     Condition No. 24

Condition No. 24 provides:  "Prior to recording the 'Final' Subdivision Map, the applicant [1] *shall contact* [KFCSD] and *submit* a written application to obtain water service (domestic & fire suppression) for all lots within [KFCSD's] boundaries, in accordance with all applicable KFCSD rules, regulations, standards, and ordinances, and [2] *shall cause* all public improvements required by KFCSD to be *completed* and *accepted* for public use."  (Italics added.)

The language in the first clause of condition No. 24 has a plain meaning. Honchariw is required to *contact* KFCSD and *submit* a written application to obtain domestic and fire suppression water source for all lots within KFCSD's boundaries.  The written application submitted shall be "in accordance with all applicable KFCSD rules, regulations, standards and ordinances."  The language in the first clause does not expressly address when the functional fire hydrants must be in place.  Furthermore, it does not reasonably support the inference that functional fire hydrants must be in place prior to the recording of the final map.  This conclusion is based on our own review of the wording of the first clause, the absence of any trial court analysis of the first clause, and the absence of an argument by County that the language reasonably supports inferences resolving the timing question raised in this litigation.

The language in the second clause of condition No. 24 requires Honchariw to "cause all public improvements required by KFCSD to be completed and accepted for public use."  This clause is unambiguously limited to public improvements required *by KFCSD*.  As a result, the clause does not support the imposition of requirements by other entities.  Accordingly, a question of fact raised by the application of this clause is what

22.

public improvements were required by KFCSD. This factual issue was not resolved in the trial court's statement of decision and a resolution of the issue is not implied by the court's analysis in reaching the conclusion that a "working fire suppression system for the future buyers of those residential lots is a Condition of Approval and must be met."[9]

This question of fact cannot be resolved as a matter of law on the appellate record. Paragraph 10 of Honchariw's October 2017 declaration asserts he "secured a conditional will serve letter and reached the outlines of an agreement with KFCSD for the water line extension, including primary and back-up booster pumps." Other documents in the record suggest there is some uncertainty as to what precisely KFCSD was requiring. For example, the May 3, 2017 letter from the department of public works to Honchariw refers to a "will serve letter" and asserts conditions discussed in the will serve letter have not been met. Honchariw responded with an e-mail stating that particular will serve letter was a nullity and "we already had a signed letter from KFCSD dated January 16, 2016, which we accepted with our check in the amount of $650."

Presented with conflicting evidence on an unresolved factual issue, we cannot make, as a matter of law, a finding of fact deciding whether "public improvements required by KFCSD" includes fire hydrants meeting the requirements sought by the department of public works. Accordingly, what public improvements are required by KFCSD must be resolved on remand. Stated from another perspective, we cannot affirm the denial of the writ petition on the ground that the words used in the second clause of condition No. 24, on their face, require fire hydrants as meeting the specifications described by the department of public works.

---

[9] Under the presumption of correctness, all intendments and presumptions are indulged to support a trial court's judgment on matters as to which the record is silent. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) Here, the trial court's statement of decision is not silent as to the court's reasoning and that reasoning did not include an application of the text of condition No. 24 or, more specifically, analysis of whether *KFCSD required* functional fire hydrants as part of the public improvements.

23.

On the question of who determines the level of water service needed to make the hydrants functional, we note condition No. 24 identifies KFCSD as the entity from which the one-acre lots will obtain water service for domestic and fire suppression. Also, the condition delegates to KFCSD the responsibility of determining the public improvements required to provide that water service. We conclude these provisions imply that KFCSD is the entity that determines the level of water service needed to make the fire hydrants functional for purposes of the conditions of approval.

D.    Condition No. 25

Condition No. 25 provides: "Prior to recording the 'Final' Subdivision Map, water service provided by [KFCSD] shall be established, constructed, and operational for the four (4) proposed 1-Acre Lots, identified as being Lots No. 4-7 on the Tentative Subdivision Map, and the designated 'Remainder' parcel."

First, we consider the meaning of the phrase "water service provided by [KFCSD]." It is reasonable to interpret the reference to "water service" to mean water used for domestic purposes and for fire suppression. Condition No. 24 referred to "water service (domestic & fire suppression)" and it is natural to read the subsequent condition as addressing the same water service addressed in condition No. 24. Accordingly, we interpret condition No. 25 as requiring the domestic and fire suppression water service provided by KFCSD to be established, constructed and operational before recording the final map.

As with the application of condition No. 24, we cannot resolve how the language in condition No. 25 applies to the facts of this case because of the unresolved questions about the public improvements required by KFCSD. Those public improvements KFCSD are the means by which domestic and fire suppression "water service [will be] provided by" KFCSD.

24.

In contrast, there is a legal question of interpretation we can resolve. Nothing in the language in condition No. 25 heightens the fire suppression water service mentioned in condition No. 24. The text of condition No. 25 simply refers to water service provided by KFCSD without mentioning any requirements for that service. The objectively reasonable interpretation of the absence of further requirements in condition No. 25 is that the requirements in condition No. 24's clause mentioning "public improvements required by KFCSD" adequately specifies the applicable requirements. Accordingly, we cannot affirm the denial of the writ petition on the ground that condition No. 25 requires functional fire hydrants meeting the specifications described by the department of public works in its 2017 correspondence with Honchariw.

In summary, an objective interpretation of the language in the conditions of approval leads to the conclusion that County delegated to KFCSD the determinations about the fire suppression water service that would need to be in place prior to the approval of the final subdivision map.[10] The fact County personnel regret this choice and now offer rational arguments for imposing requirements beyond those required by KFCSD prior to approving the final map is not a justification for altering the conditions of approval as drafted.

E. Other Arguments

County argues that waiting until after subdivision approval to address the common problem of a system of fire hydrants for the subdivision "would force multiple property owners to coordinate to implement a common solution." County states this problem of

---

[10] In contrast, the fire protection measures required for *new structures* built on the subdivided lots will be determined at the building permit stage in accordance with applicable law. From the record presented, it does not appear KFCSD has the authority to determine the fire protection measures imposed at the building permit stage. Honchariw's July 17, 2017 e-mail to KFCSD's counsel and the department of public works is consistent with this view, stating: "The Fire Marshall is fully authorized to set fire suppression measures at permitting and construction, including case-by-case adjustments, under Appendix B" to the Fire Code.

25.

collective action is exactly the kind of problem the Subdivision Map Act was intended to forestall by requiring local agencies to plan for those common issues and ensure the necessary infrastructure is constructed or guaranteed to be constructed before the lots are severed and sold to individual buyers. County characterizes Honchariw's approach as punting the fire suppression safety issue to the multiple purchasers of the subdivided lots, which is inconsistent with the statutory purpose and the conditions of approval imposed to serve that purpose.

County's policy argument does not present a compelling reason for interpreting the conditions of approval to contain requirements not set forth in the text of those conditions. For instance, the safety concerns related to fire arises when structures are built on the lots, not when a final subdivision map is recorded. Concerns about efficiency and coordination are not as significant as in a large subdivision of tract housing. Here, the public improvements will serve only four lots. The fact that the policy considerations involving safety, efficiency and coordination existed when the Board approved the conditions of approval suggests the Board felt those considerations had been adequately dealt with in the conditions. County drafted condition No. 24 using language that demonstrates it was willing to rely on KFCSD to establish the requirements for the public improvements needed to provide water service for domestic and fire suppression. Thus, County appeared content to delegate the fire safety concerns to KFCSD. Similarly, County drafted condition No. 40 without addressing the question of timing. If the policy of coordinating the fire hydrant system for the four contiguous one-acre lots prior to the approval of the final map was important to County, it should have drafted the conditions to reflect this importance.

We note the record presented leaves open the possibilities the department of public work's requirement for functional fire hydrants represents (1) a change in position by County personnel from the views County personnel held when the vesting tentative map was approved; (2) an attempt to address a specific detail not fully thought through when

26.

the tentative map was approved; or (3) the same position held by some County personnel when the tentative vesting was approved. The existence of these various possibilities and determining which is true is not material to the interpretation of the conditions of approval and the application of the provisions of the vesting tentative map statute. The language in the conditions of approval must be given an objectively reasonable interpretation as to what they require and, as a result, the subjective state of mind of the various officers and employees of County about what the conditions of approval meant is not relevant to the resolution of this appeal.[11] The vesting tentative map statute protects the objective reasonable expectations of the subdivider and, as a necessary corollary, the local agency is responsible for clearly stating the conditions attached to the vesting tentative map approval.

F.       Appellate Relief

Honchariw's appellate briefs requested that the judgment be vacated and the matter remanded with directions to (1) issue a writ of mandate prohibiting County from demanding a fire suppression system as part of the water line extension and (2) hold a trial on the merits of the claim for damages resulting from the unlawful violation of his statutory vested rights. In comparison, County requested the judgment be affirmed.

Our initial opinion reversed and remanded for further proceedings to resolve certain questions, which included issues of fact involving condition No. 24: (1) Has Honchariw submitted a written application to obtain water service for the four one-acre lots in accordance with KFCSD's rules, regulations, standards and ordinances? (2) What public improvements have been required by KFCSD, which includes the specific

---

[11]     In the context of contract interpretation, California recognizes the objective theory, under which it is the objective intent, as evidenced by the words of the contract, rather that the subjective intent of one of the parties, that controls interpretation. (*Iqbal v. Ziadeh* (2017) 10 Cal.App.5th 1, 8.) Whether the subjective intent of County officials and employees is relevant to Honchariw's claim for damages is an issue beyond the scope of the appellate briefing and this opinion.

subissue of whether KFCSD has required fire hydrants meeting the requirements sought by the department of public works? (3) Have "all public improvements required by KFCSD [been] completed"? (4) Have the completed public improvements been "accepted for public use"? We determined that, after resolving these questions, the trial court could (1) determine whether to issue a writ and the terms of any such writ and (2) address procedural and substantive questions relating to Honchariw's complaint for damages.

After the opinion was filed, both parties filed a petition for rehearing. County requested one clarification. Honchariw requested the appellate relief be modified to "remand with directions to issue a writ of mandate prohibiting the County from demanding any fire suppression measures not incorporated in the KFCSD-approved April 14, 2016 plans submitted by Honchariw to the department of public works." We directed County to file an answer to Honchariw's petition.

### 1.     Issues Involving Condition No. 24

The status of the four questions of fact relating to Honchariw's satisfaction of the requirements of condition No. 24 are addressed in Honchariw's petition for rehearing and County's answer. The parties agree that no improvements required by KFCSD have been completed and no such improvements have been accepted for public use.

The parties disagree about whether the first and second questions involving condition No. 24 can be answered on the current record. Honchariw contends the developer agreement attached to the e-mail from KFCSD's counsel answers the first question about whether he submitted a water service application to KFCSD. Honchariw asserts the recital in the developer agreement states the agreement was being entered into "[p]ursuant to the Will Serve Letter between [KFCSD] and [Honchariw] dated January 24, 2016." Honchariw contends this statement confirms that he made the requisite application for water service.

28.

On the second question about what public improvements were required by KFCSD, Honchariw asserts "KFCSD expressly accepted the April 14, 2016 improvement plans submitted by Honchariw to the County. [Citation.] As noted in Honchariw's email of July 17, *supra*, those plans deferred hydrants at the request of KFCSD." Honchariw refers to the July 24, 2017 e-mails from the department of public works, notes the department only raised issues relating to fire suppression and fire hydrants, and infers there is no dispute over the public improvements demanded by KFCSD.

County argues the appellate record contains conflicting and incomplete evidence about Honchariw's application to KFCSD and what improvements KFCSD required. County notes documents in the record refer to at least three different will serve letters and none of the letters are themselves included in the record.[12] Thus, County contends: "It is not clear which of these letters is valid, let alone whether any of them responds to a completed application." As to the improvements required by KFCSD, County argues the draft developer agreement is unsigned and the plans included in the record do not identify what improvements were required by KFCSD.

Based on our review of the record and the arguments presented, we conclude the factual issues relating to Honchariw's submission of an application to KFCSD and the public improvements required by KFCSD cannot be resolved as a matter of law. Instead, those issues must be resolved by a trier of fact in the first instance. Accordingly, further proceedings in the trial court are "necessary" and "proper" for purposes of Code of Civil

---

[12]  An example of a will serve letter from a services district is contained in *Winnaman v. Cambria Community Services Dist.* (1989) 208 Cal.App.3d 49: "On February 8, 1984, Winnaman obtained a 'will serve' letter from [Cambria Community Services District]. The letter stated in pertinent part: 'To Whom it May Concern: [¶] This letter serves as notification that the District will serve water and sewer to [Winnaman's parcel] for COMMERCIAL SERVICES ONLY upon presentation of your Coastal Development Permit and the payment of the fees.' " (*Id*. at p. 52.)

Procedure section 906. As a result, the appellate relief will include a remand for "further proceedings to be had." (Code Civ. Proc., §§ 43, 906.)

    2.    *Writ of Mandate*

The next question we consider is whether the unresolved issues about Honchariw's fulfillment of the requirements set forth in condition No. 24 preclude this court from directing the issuance of a writ of mandate. Generally, a writ of mandate is a vehicle to compel public officials to perform a legal duty, typically one that is ministerial. (*Weiss v. City of Los Angeles* (2016) 2 Cal.App.5th 194, 204.) While mandate will not lie to control a public agency's discretion and force it to exercise that discretion in a particular way, it will lie to correct an abuse of discretion or compel the performance of a ministerial task. (*Ibid*.) Thus, a writ of mandate can be obtained by showing a clear, present and ministerial duty on the part of County and a clear, present and beneficial right on the petitioner's part to the performance of that duty. (*Calvert v. County of Yuba* (2006) 145 Cal.App.4th 613, 632.)

Here, Honchariw has established (1) a clear, present and beneficial right to have the conditions of approval in the vesting tentative map properly interpreted and (2) County has a ministerial duty to interpret those conditions of approval as set forth in this opinion. Because Honchariw has established that County officials have not been properly interpreting the conditions of approval, he is entitled to a writ of mandate directing County and its officials to interpret the conditions as stated herein when those officials take further actions involving Honchariw's proposed subdivision. In other words, County and its officials have no discretionary authority to contradict the interpretation set forth in this decision. As a result, employing that interpretation can now be described as a ministerial obligation.

Consequently, on remand, the trial court shall issue a writ of mandate directing County and its officials to interpret the conditions of approval as set forth in this opinion.

Prior to issuing the writ, the trial court shall conduct further proceedings to resolve the questions involving the application of condition No. 24 to the facts of this case and any other issues relevant to determining any additional terms that should be included in the writ of mandate.**13**

## DISPOSITION

The judgment is reversed. The trial court is directed to vacate its statement of decision and, on remand, conduct further proceedings not inconsistent with this opinion and to determine the terms of the writ of mandate, which, at a minimum, shall require County and its officials to interpret the conditions of approval as set forth in this opinion.

Honchariw shall recover his costs on appeal.

FRANSON, J.

WE CONCUR:

POOCHIGIAN, Acting P.J.

PEÑA, J.

---

**13** We note other issues remain at large. They include procedural questions relating to how Honchariw's complaint for damages should be handled on remand and substantive questions about the merits of his claims.